USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
-?C #: ____
DATE FILED: 9/29/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -x

DEUTSCHE BANK SECURITIES INC.,          :

                    Plaintiff,          :

        - against -                     :          **OPINION**

JAMES M. RHODES, SAGEBRUSH              :          06 Civ. 413 (DC)
ENTERPRISES, INC., THE RHODES
COMPANIES, LLC, HERITAGE LAND           :
COMPANY, LLC, RHODES DESIGN AND
DEVELOPMENT CORPORATION and             :
RHODES RANCH GENERAL PARTNERSHIP,
                                        :
                    Defendants.
                                        :
- - - - - - - - - - - - - - - - - - -x

**APPEARANCES:**    (see last page)

**CHIN, District Judge**

In this case, defendants engaged plaintiff Deutsche
Bank Securities, Inc. ("DBSI") to provide investment banking
assistance in their efforts to obtain financing.  They hired DBSI
on an exclusive basis.

Defendants did not, however, obtain financing with
DBSI's assistance.  Rather, during the period of exclusivity,
they obtained $500 million of financing with the assistance of
another investment banking firm.

Countering that it is entitled to a fee nevertheless,
DBSI sues defendants James M. Rhodes ("Rhodes"), Sagebrush
Enterprises, Inc. ("Sagebrush"), The Rhodes Companies, LLC ("The
Rhodes Companies"), Heritage Land Company, LLC ("Heritage"),
Rhodes Design and Development Corporation, and Rhodes Ranch

General Partnership to recover damages for breach of contract among other claims. Sagebrush counterclaims for breach of contract and professional malpractice.

Before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, the motions are granted in part and denied in part.

## BACKGROUND

### A.    The Facts

For purposes of these motions, where all parties seek summary judgment, I accept as true factual allegations that are not disputed and those that are supported by the evidentiary materials, except that I have noted factual disputes where they exist.

### 1.    The Parties

DBSI provides investment banking services and also acts as a broker and dealer of securities for corporate and individual investors. (Am. Compl. ¶ 2).

Sagebrush, The Rhodes Companies, Heritage, Rhodes Design and Development Corporation, and Rhodes Ranch General Partnership are part of a group of entities operating in the homebuilding business in Nevada and Arizona under the name "Rhodes Homes." (Am. Answer. ¶¶ 4-8; Sussman Decl. Ex. S). Rhodes is the president of or otherwise affiliated with the companies that make up the Rhodes Homes organization. (Stewart Decl. Ex. 13 at 2).

-2-

## 2. **The Engagement Letter**

In 2003, Rhodes and former Rhodes Homes employee Edward Kim met with DBSI in New York City to discuss possible debt financing arrangements. (Sussman Dec. Ex. R at 17). The purpose of the meeting was to discuss "flexible, cheap, or affordable financing" suitable for the various different entities for which Rhodes served as president or employee. (Id.).

Subsequently, on February 25, 2004, DBSI executed a financing engagement letter (the "Engagement Letter") with Rhodes Homes "to confirm the engagement of DBSI by [Rhodes Homes] and [Rhodes Homes's] subsidiaries in connection with the issuance or sale of the Securities."[1] (Id. Ex. A at 1 ("Engagement Letter")). The Engagement Letter is a six-page letter from DBSI to "Rhodes Homes," "Attention: Jim Rhodes, President." (Id.). It was agreed to and accepted by "Rhodes Homes," by Rhodes as President. (Id. at 4).

The term "Securities" referred to debt securities issued in a private placement or public offering. (Engagement Letter at 1). DBSI was retained on an exclusive basis to arrange for the sale or issuance of the Securities. (Id.). The Engagement Letter also contained a provision requiring DBSI's written consent prior to the sharing of its analyses, evaluations or advice by Rhodes Homes with other parties. (Id. at 4). The

---

[1]     The Engagement Letter states that its purpose is "to confirm the engagement of DBSI by you and your subsidiaries." (Engagement Letter at 1). The terms "you" and "Company" are defined under the Agreement to mean Rhodes Homes. (Id.).

agreement was governed by New York law, and Rhodes Homes submitted to the jurisdiction of New York courts for disputes related to the agreement. (Id. at 5).

### 3. **The Addendum**

On December 14, 2004, DBSI and Rhodes Homes executed an addendum to the Engagement Letter (the "Addendum"). The Addendum stated as follows:

> The purpose of this addendum (the "Addendum" and together with the Engagement Letter, the "Agreement") is to confirm the engagement of DBSI by [Rhodes Homes] and [its] subsidiaries in connection with a $300 million senior secured credit facility consisting of a term loan facility and/or a revolving credit facility (the "Facilities").

(Sussman Decl. Ex. B ("Addendum")).

As with the sale or issuance of securities contemplated in the Engagement Letter, the arrangement with DBSI under the Addendum was exclusive in nature:

> [T]he Company hereby retains DBSI on an exclusive basis until the earlier of (x) one year from the date hereof and (ii) the date that the Company and DBSI reasonably determine that the closing of the Facilities cannot be consummated within such one year period because of adverse market conditions (the "Exclusivity Period"). During the Exclusivity Period, the Company agrees that DBSI shall have the right, but not the obligation, to act as sole book-running manager, and DBSI has the right but not the obligation, to act as exclusive underwriter, initial purchaser, placement agent or syndication agent in connection with any bank or loan financing consisting of institutional and/or pro rata loans of, the Company or its subsidiaries during the term of this Agreement on a best efforts basis. In addition, during the Exclusivity Period, an

-4-

> affiliate of DBSI shall have the right but
> not the obligation to act as the
> administrative agent under any such bank or
> loan financing.

(Addendum at 1).

The parties agreed that DBSI would earn its fees based on the total principal amount of debt financing obtained:

> In connection with any such bank
> financing, the non-refundable fees payable by
> the Company shall be as follows:
>
> (a) in the event of a closing of any
> facility, an underwriting or placement fee of
> 2.25% of the total aggregate principal amount
> of the Facilities, payable at the closing of
> such issuance, less any amounts paid pursuant
> to clause (b) hereof, . . . .

(Id.).

In addition, Rhodes Homes was to pay an upfront fee of $100,000 upon execution of the Addendum to be credited to any amounts payable for reasonable fees and out-of-pocket expenses incurred by DBSI in connection with the transaction. (Id. at 2). Rhodes Homes was also to pay an annual "administrative agent fee" of $135,000 each year until the "Facilities" were terminated in full. (Id.).

With the execution of the Addendum, "all of the provisions of the Engagement Letter remain[ed] in full force and effect." (Id.). The Addendum was signed by the same individuals, acting in the same capacities, who signed the Engagement Letter.

-5-

## 4. **Performance of the Agreement and Rhodes Homes's Changing Needs**

The $300 million debt financing transaction contemplated by DBSI and Rhodes Homes in the Addendum never came to fruition. Performance of the agreement was slowed by various delays, including delay in the property appraisal conducted by Cushman & Wakefield of California, the real estate services firm selected by DBSI. (Stewart Decl. Exs. 41-50).

Additionally, at some point in 2005, Rhodes Homes determined it needed substantially more than $300 million in debt financing. (Stewart Decl. Ex. 11 at 129, Ex. 60). At times, DBSI appeared to have discouraged financing significantly above $300 million. (See Sussman Decl. Exs G, I at 129; Stewart Decl. Ex. 58). At other times, however, DBSI appeared to have told Rhodes Homes $400 million or more "was attainable." (Stewart Decl. Ex. 61; see also Sussman Decl. Ex. O).

By mid-2005, if not before, Rhodes Homes was unhappy with DBSI's performance. (Stewart Decl. in Opp'n Ex. 82 at 53-60; Sussman Decl. Ex. F at 149-50). Despite these problems and disagreements, DBSI and Rhodes Homes continued to engage in regular communications about different aspects of the planned transaction into June 2005. (See Sussman Decl. Ex. G).

## 5. **Termination of the Agreement**

On June 23, 2005, Rhodes Homes's chief operating officer Fred Chin sent an email to Stephanie Perry of DBSI expressing serious concerns about progress under the Agreement.

(Stewart Decl. Ex. 50). In response to Chin's email, DBSI defended itself by noting Rhodes Homes had yet to turn over outstanding due diligence items and a finalized financial model. (Sussman Decl. Ex. J). Nevertheless, DBSI expressed its commitment to "structuring a successful refinancing for Rhodes Homes" and maintained confidence that the contemplated transaction would be "on a timeline to launch and price before the late-August debt markets 'shut-down.'" (Id.).

It was not to be for DBSI. On July 1, 2005, Chin wrote to DBSI terminating their relationship, stating Rhodes Homes was "not convinced that a transaction can be structured that is both saleable in that market and compatible with our needs at this time; in fact, we are convinced to the contrary." (Id. Ex. G at 1). Rhodes Homes advised DBSI that it had "concluded that, at this point in the evolution of our company, [DBSI] cannot address our need in regard to debt financing. We have determined to explore other sources of capital and potential lenders." (Id. at 2).

The parties dispute whether DBSI agreed to the termination of the Agreement. Rhodes claims DBSI had suggested Rhodes Homes seek other banks to arrange the financing because DBSI was unable to complete the contemplated transaction. (Rhodes Decl. ¶ 5; Stewart Decl. in Opp'n Ex. 81 at 118). Other evidence in the record, however, indicates DBSI never acknowledged that it could not deliver on a $300 million credit facility. (Sussman Decl. Ex. I at 129). As of the end of June

-7-

2005, moreover, the record suggests that DBSI continued to plan on completing the transaction. (Id. Ex. J).

## 4. Rhodes Homes's Financing Agreement with Credit Suisse First Boston

Around the time its relationship with DBSI was deteriorating, Rhodes Homes entered into debt financing discussions with CSFB, an investment bank not party to this action. (Stewart Decl. Exs. 64, 65). Rhodes Homes executed a confidentiality agreement with CSFB on or around May 17, 2005. (Sussman Decl. Ex. D). Shortly thereafter, CSFB sent Rhodes Homes a proposal for a $400 million senior secured credit facility. (Id. Ex. O). Ultimately, Sagebrush executed an engagement letter with CSFB in July 2005, retaining CSFB to obtain "senior secured credit facilities in an aggregate principal amount" of $400 million, an amount that could be increased "to the extent agreed upon by the parties." (Id. at 1).

CSFB arranged for senior secured credit facilities totaling $500 million for Heritage, The Rhodes Companies, and Rhodes Ranch General Partnership. (Id. Ex. V). The facilities consisted of a first lien facility for $430 million and a second lien facility for $70 million. (Id.).

## B. Procedural History

DBSI filed the complaint in this action on January 19, 2006, against The Rhodes Companies, Heritage, Rhodes Ranch General Partnership, and Rhodes for breach of contract, breach of

the implied covenant of good faith and fair dealing, intentional and negligent misrepresentation, misappropriation, quantum meruit, unjust enrichment, indemnification, and account stated. On October 6, 2006, DBSI filed an amended complaint, adding Rhodes Design and Development Corporation and Sagebrush as defendants and dropping their misrepresentation claims against all defendants. On November 10, 2006, Sagebrush brought counterclaims against DBSI for breach of contract and professional malpractice.

Discovery closed in the fall of 2007 and these cross-motions for summary judgment followed.

## DISCUSSION

I address (a) the standards applicable to summary judgment motions, (b) defendants' motion for summary judgment, and (c) DBSI's motion for summary judgment.

## A. The Summary Judgment Standard

Summary judgment will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a

-9-

dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248; see Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991). In a breach of contract action, summary judgment is appropriate if "the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." Farago Adver., Inc. v. Hollinger Int'l, Inc., 157 F. Supp. 2d 252, 258 (S.D.N.Y. 2001).

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The nonmoving party "must present concrete particulars and cannot succeed with purely conclusory allegations." Fitch v. R.J. Reynolds Tobacco Co., 675 F. Supp. 133, 136 (S.D.N.Y. 1987) (citation omitted). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. Anderson, 477 U.S. at 249-50. As the Court held in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. (citations omitted).

## B.  Defendants' Motion for Summary Judgment

Defendants move for summary judgment dismissing DBSI's claims (1) for breach of contract, (2) for breach of the implied covenant of good faith and fair dealing, (3) for misappropriation, and (4) against Rhodes individually. I discuss each prong of the motion in turn.

-10-

## 1. **Breach of Contract**

Defendants seek dismissal of DBSI's breach of contract claim on the grounds (a) the Addendum is unenforceable (for lack of consideration and other reasons) and (b) even assuming it is enforceable there was no breach because under the plain terms of the Addendum defendants engaged DBSI to help obtain $300 million in financing, and therefore defendants were not precluded from turning to CSFB to obtain $500 million in financing. (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") at 15-19).

### a. **Enforceability of the Addendum**

Defendants' motion for summary judgment is denied to the extent defendants contend the Addendum is unenforceable. Indeed, to the contrary, two of the asserted grounds -- lack of consideration and the purported conflict of interest on the part of Edward Kim -- are rejected as a matter of law. Defendants' remaining attacks on the enforceability of the Addendum -- based primarily on DBSI's purported poor performance -- are not a basis for summary judgment because they raise issues of material fact that must be addressed at trial.

As a matter of law, even assuming the Addendum was not supported by consideration, the lack of consideration does not preclude enforcement of the Addendum. Under New York law, consideration is required for a contract to be valid. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004); Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 464 (1982).

-11-

Modifications to a contract, however, need not be supported by additional consideration when the modification is in writing and signed by the party against whom it is sought to be enforced. N.Y. Gen. Oblig. Law § 5-1103 (McKinney 2007); GG Managers, Inc. v. Fidata Trust Co. New York, 215 A.D.2d 241, 241-42 (1st Dep't 1995).

Here, there is no claim that the Addendum is a separate contract between Rhodes Homes and DBSI distinct from the Engagement Letter. Indeed, the document refers to itself as an "addendum," and it clearly is a modification of or supplement to the Engagement Letter. See Black's Law Dictionary 38 (7th ed. 1999) (defining "addendum" as "something to be added, esp. to a document; a supplement"). On its face, the Addendum carries forward "all of the provisions of the Engagement Letter." (Addendum at 2). Additionally, the two documents, the Engagement Letter and the Addendum, are referred to as "the Agreement" in the Addendum. (Addendum at 1). In light of these uncontested facts, then, the Addendum constitutes a modification of the previous agreement between Rhodes Homes and DBSI. Defendants concede the Engagement Letter was supported by adequate consideration. (Defs.' Mem. at 16). Therefore, because the terms of the modification were in a writing and signed by representatives from DBSI and Rhodes Homes, the lack of additional consideration does not render the Addendum unenforceable. This defense is rejected as a matter of law.

Defendants also claim DBSI's failure to alert Rhodes Homes about the alleged conflict of interest on the part of Edward Kim, a former Rhodes Homes executive who later joined DBSI, voided the contract. (Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("Defs.' Opp'n Mem.") at 19-21). In support of this contention, however, defendants present only evidence showing that Kim told DBSI representatives "of his interest to try to get into finance." (Stewart Decl. Ex. 7 at 36). Kim left Rhodes Homes on April 28, 2005, and started work with DBSI on May 1, 2005. (Id. Ex. 3 at 284-85). The record contains no evidence to suggest that DBSI began discussing possible employment with Kim at any time during or prior to the signing of the Addendum in December 2004 or the Engagement Letter in February 2004. Though the record shows DBSI was aware that Kim was "rooting" for DBSI to obtain the contract with Rhodes Homes (Stewart Decl. in Opp'n Ex. 80 at 124), it contains no evidence that DBSI was aware of any improper motives or conflict of interest on Kim's part. The speculations of Rhodes and other Rhodes Homes employees cannot suffice as evidence that would support a jury verdict on this point. See Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Defendants fail to raise a genuine issue of material fact regarding the role of Kim in the execution of the Addendum, and thus summary judgment is granted in favor of DBSI striking this defense.

Defendants' other attacks on the enforceability of the Addendum need not be addressed at length here because they turn

on genuine issues of material fact that can only be resolved at trial. Defendants claim the purpose of the Addendum had been frustrated through no fault of Rhodes Homes, thereby permitting Rhodes Homes to rescind the contract and look elsewhere for funding. (Defs.' Opp'n Mem. at 16-17). But this claim is sharply disputed by DBSI. Additionally, defendants claim DBSI abandoned and waived its rights under the Addendum. (Id. at 17-18). Although they have presented some evidence to support this assertion, DBSI has presented evidence to the contrary as well. Hence, these matters must be resolved at trial.

### b. **Interpretation of the Addendum**

Defendants argue that, even assuming the Addendum is enforceable, they are entitled to summary judgment dismissing DBSI's breach of contract claim because the Addendum's plain language did not prohibit them from turning to another investment banking firm to seek $500 million in debt financing rather than the $300 million that was the subject of the Addendum. I disagree.

### i. **Applicable Law**

The rules of contract interpretation are well-settled and are set forth in the summary judgment context in Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425 (2d Cir. 1992):

> In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use. When the question is the contract's proper construction, summary judgment may be granted when its words convey a definite and precise

-14-

> meaning absent any ambiguity. Where the
> language used is susceptible to differing
> interpretations, each of which may be said to
> be as reasonable as another, and where there
> is relevant extrinsic evidence of the
> parties' actual intent, the meaning of the
> words become an issue of fact and summary
> judgment is inappropriate, since it is only
> when there is no genuine issue as to any
> material fact that the moving party is
> entitled to judgment as a matter of law.

Id. at 428 (citations omitted); see also Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993) (summary judgment may be granted "only where the agreement's language is unambiguous and conveys a definite meaning"); Nycal Corp. v. Inoco PLC, 988 F. Supp. 296, 298 (S.D.N.Y. 1997) (summary judgment "is clearly permissible when the language of the contract provision in question is unambiguous") (citations omitted), aff'd, 166 F.3d 1201 (2d Cir. 1998).

Therefore, in a contract interpretation case under New York law, the Court must first decide whether the contract is ambiguous. See Morse/Diesel, Inc. v. Trinity Indus., Inc., 67 F.3d 435, 443 (2d Cir. 1995) (citing Sayers, 7 F.3d at 1094). A contractual provision will be deemed ambiguous "whenever it admits of more than one interpretation 'when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in a particular trade or business.'" MG Refining & Mktg., Inc. v. Knight Enters., Inc., 25 F. Supp. 2d 175, 180

-15-

(S.D.N.Y. 1998) (quoting <u>Nowak v. Ironworkers Local 6 Pension Fund</u>, 81 F.3d 1182, 1192 (2d Cir. 1996)); <u>see also</u> <u>Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank</u>, 57 F.3d 146, 152 (2d Cir. 1995). Conversely, contract language is not ambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." <u>Sayers</u>, 7 F.3d at 1095 (quoting <u>Breed v. Ins. Co. of N. Am.</u>, 46 N.Y.2d 351, 355 (1978)); <u>see also</u> <u>M.H. Segan Ltd. P'ship v. Hasbro</u>, 924 F. Supp. 512, 525 (S.D.N.Y. 1996).

Moreover, "'language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation. The court is not required to find the language ambiguous where the interpretation urged by one party would strain . . . the contract language beyond its reasonable and ordinary meaning.'" <u>Hunt Ltd. v. Lifschultz Fast Freight, Inc.</u>, 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting <u>Bethlehem Steel Co. v. Turner Constr. Co.</u>, 2 N.Y.2d 456, 459 (1957)); <u>see also</u> <u>Seiden Assocs.</u>, 959 F.2d at 428.

If the agreement sets forth the parties' intent clearly and unambiguously, the Court need not look to extrinsic evidence to determine the parties' obligations under the contract. <u>See</u> <u>Stroll v. Epstein</u>, 818 F. Supp. 640, 643 (S.D.N.Y.), <u>aff'd</u>, 9 F.3d 1537 (2d Cir. 1993); <u>Sterling Drug Inc. v. Bayer AG</u>, 792 F. Supp. 1357, 1365-66 (S.D.N.Y. 1992), <u>aff'd in part, remanded in</u>

-16-

part, 14 F.3d 733 (2d Cir. 1994); Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56 (1979); West, Weir & Bartel, Inc. v. Mary Carter Paint Co., 25 N.Y.2d 535, 540 (1969), modified on other grounds, 26 N.Y.2d 969 (1970). If the language of the contract is ambiguous, however, extrinsic evidence of the parties' intent is admissible. Space Imaging Europe, Ltd. v. Space Imaging L.P., 38 F. Supp. 2d 326, 334 (S.D.N.Y. 1999) (citing Seiden Assocs., 959 F.2d at 428).

### ii. **Application**

Defendants argue the Addendum's exclusivity provision applies only to the $300 million senior secured credit facility contemplated by the parties, such that defendants' transaction arranged by CSFB for a $500 million facility was not foreclosed by the Addendum. (Defs.' Mem. at 18-19). Defendants' interpretation of the Addendum's exclusivity provision is unreasonable; indeed, I hold, as a matter of law, that the plain and unambiguous language of the Addendum gave DBSI the exclusive right to act as investment banker with respect to any amount of financing that otherwise fell within the scope of the Addendum. See Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d at 1277.

While the Addendum's stated purpose was to "confirm the engagement of DBSI . . . in connection with a $300 million senior secured credit facility consisting of a term loan facility and/or a revolving credit facility (the "Facilities")," the exclusivity provision of the Addendum outlining DBSI's rights under the contract is much broader. (Addendum at 1). The Addendum grants

-17-

DBSI the right to act as "sole book-running manager, . . . exclusive underwriter, initial purchaser, placement agent or syndication agent in connection with any bank or loan financing consisting of institutional and/or pro rata loans" on behalf of Rhodes Homes and its subsidiaries during the "Exclusivity Period."[2] (Addendum at 1) (emphasis added). The exclusivity provision does not refer to the defined term "Facilities," which immediately follows the phrase "$300 million senior secured credit facility consisting of a term loan facility and/or a revolving credit facility," nor is it limited to $300 million in "bank or loan financing." Moreover, the fee provision likewise refers to "any such bank financing," without limitation as to amount, and provides a percentage formula for payment of part of the fee. If the parties had intended a set amount of $300 million, there would have been no need for a percentage as the parties could have specified a dollar figure (i.e., 2.25% of $300 million). Finally, the exclusivity provision would have had little meaning if defendants' interpretation is correct, for under their interpretation defendants could have undermined DBSI's right to exclusivity merely by insisting on an amount slightly higher than $300 million, e.g., $305 million.

---

[2]    The "Exclusivity Period" is defined as one year from the Addendum's execution date or the date Rhodes Homes and DBSI "reasonably determine that the closing of the Facilities cannot be consummated within such one year period because of adverse market conditions," whichever is earlier. (Addendum at 1). Plaintiff and defendants disagree about the definition of the terms "Facilities" and "adverse market conditions." Any ambiguity about the meaning of these terms, however, only makes the duration, not the breadth, of DBSI's exclusive rights ambiguous.

-18-

Accordingly, DBSI's "rights" under the Addendum were not limited to a transaction involving a $300 million senior secured credit facility. Instead, DBSI had exclusive rights to act in various capacities in connection with "any bank or loan financing consisting of institutional and/or pro rata loans." The $500 million senior secured credit facilities arranged by CSFB clearly constituted "bank or loan financing consisting of institutional and/or pro rata loans." (See Sussman Decl. Ex. V).

Defendants rely on certain extrinsic evidence that they claim support their interpretation of the Addendum. This reliance is misplaced, as the extrinsic evidence is considered only if the Addendum is ambiguous; I hold that it is not.

This prong of defendants' motion therefore is denied, and defendants' proffered interpretation of the Addendum is rejected as a matter of law.

## 2. **Breach of the Implied Covenant of Good Faith and Fair Dealing**

Defendants move to dismiss DBSI's claim for breach of the implied covenant of good faith and fair dealing as redundant to its breach of contract claim. Their motion is granted.

Every contract governed by New York law contains an implied covenant of good faith and fair dealing. M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990). Claims of breach of the implied covenant, however, must be premised on a different set of facts from those underlying a claim for breach of contract. This is because, under New York law, breach of the

-19-

implied duty of good faith is considered a breach of the
underlying contract. Harris v. Provident Life & Acc. Ins. Co.,
310 F.3d 73, 80 (2d Cir. 2002) (citing Fasolino Foods Co. v.
Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992)).
Accordingly, a party may maintain a claim for breach of the
implied covenant only if the claim is based on allegations
different from the allegations underlying the accompanying breach
of contract claim. Siradas v. Chase Lincoln First Bank, N.A.,
No. 98 Civ. 4028 (RCC), 1999 WL 787658, at *6 (S.D.N.Y. Sept. 30,
1999). Otherwise a claim for breach of the implied covenant will
be dismissed as redundant. ICD Holdings S.A. v. Frankel, 976 F.
Supp. 234, 243-44 (S.D.N.Y. 1997).

    Here, DBSI acknowledges that its claim for breach of
the implied covenant of good faith and fair dealing is premised
on the same factual allegations as its breach of contract claim.
(Pl.'s Opp'n Mem. at 20). It claims, however, that because its
motion for partial summary judgment seeks a determination on only
an unrelated part of its contract claim, its claim for breach of
the implied covenant should survive for trial. This argument is
irrelevant. DBSI's breach of contract claim is broader than its
claim for breach of the implied covenant; the factual allegations
in its contract claim encompass and include the factual
allegations in its breach of implied covenant claim. Thus the
claim for breach of the implied covenant is redundant and must be
dismissed. ICD Holdings S.A., 976 F. Supp. at 243-44.

## 3. **Misappropriation**

Defendants move to dismiss DBSI's misappropriation claim for lack of evidence that any of the defendants used DBSI's proprietary information in the CSFB deal. Defendants' motion is granted.

Under New York law, the wrongful use of a party's confidential, proprietary work product can support a claim for misappropriation of trade secrets.[3] To establish misappropriation of a trade secret, a plaintiff must prove that it possessed a trade secret and that defendants used or are using the trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. Inflight Newspapers, Inc. v. Magazines In-Flight, LLC, 990 F. Supp. 119, 126 (E.D.N.Y. 1997) (citing Integrated Cash Mgmt. Servs. Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990)). A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 407 (1993) (citations omitted).

---

[3]     DBSI's complaint makes a claim for "misappropriation." Based on a reading of the complaint and DBSI's response to defendants' motion for summary judgment, the Court reads this claim as alleging a cause of action for misappropriation of trade secrets under New York law. Though DBSI does not explicitly refer to such information as "trade secrets," the allegations in their complaint match the elements of the claim.

-21-

Here, the Engagement Letter expressly required Rhodes Homes to obtain DBSI's written consent prior to sharing or referencing any of DBSI's work product related to the transaction. (Engagement Letter at 4). Even drawing all inferences in favor of the non-moving party, however, DBSI fails to raise a genuine issue of material fact as to whether defendants misappropriated DBSI's proprietary information in the CSFB deal or any other deal. At most, DBSI can show only that defendants breached the confidentiality provision of their contract, but such breach cannot support liability in tort for misappropriation unless an independent duty has been violated. See Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389 (1987). Plaintiff does not establish such independent duty here.

A reasonable jury could not reach a verdict in DBSI's favor based on the evidence in the record. First, DBSI cites to the confidentiality agreement executed between Rhodes Homes and CSFB, presumably as circumstantial evidence of information sharing between the two entities. (Pl.'s Opp'n Mem. at 20-21; Sussman Decl. in Opp'n Ex. 4). Without more, however, existence of the Rhodes Homes-CSFB confidentiality agreement does not suggest that Rhodes Homes shared DBSI's proprietary information with CSFB. Second, DBSI also cites a May 25, 2005, email from Jeremy Rogers at CSFB to Rhodes Homes's Fred Chin that references "review[ing] the model" and states "great meeting you last week and hearing about the Rhodes Homes history and strategy going

forward." (Sussman Decl. in Opp'n Ex. 4). DBSI claims the email
shows Rhodes Homes provided CSFB with financial models
incorporating DBSI work product. (Pl.'s Opp'n Mem. at 21). This
evidence, however, does not indicate that "the model"
incorporated DBSI work product or that any DBSI work product was
shared with CSFB at the meeting mentioned. In fact, other
evidence in the record indicates that the financial model was
prepared by Rhodes Homes and that it was long delayed in being
handed over to DBSI. (Sussman Decl. Ex. L at 211).

    Third, DBSI cites the July 1, 2005, termination letter
sent to DBSI from Rhodes Homes, which references DBSI's advice
and analysis of different financing transactions. (Sussman Decl.
in Opp'n Ex. 4). DBSI claims, without evidentiary support, that
the letter was shared by Rhodes Homes with CSFB. Even if the
letter was shared by Rhodes Homes with CSFB, however, none of the
information within the letter can be considered a "formula,
pattern, device or compilation of information" utilized in one's
business that provides an advantage over competitors. Ashland
Mgmt. Inc. v. Janien, 82 N.Y.2d at 407. The letter is simply too
general.

    Finally, DBSI cites the appraisal conducted by Cushman
& Wakefield of California for DBSI and emails exchanged between
Jeremy Rogers of CSFB and Dean Paauw at Cushman & Wakefield that
reference the forwarding of "appraisals." (Sussman Decl. in
Opp'n Ex. 4). Even assuming the appraisals completed by Cushman
& Wakefield could be considered DBSI's proprietary information or

-23-

trade secrets, DBSI fails to establish that any of the defendants
were involved in the wrongful use of such information.  The
evidence shows only that CSFB may have obtained the appraisals.
It does not indicate whether the information came from defendants
or from Cushman & Wakefield.

DBSI's evidence is therefore insufficient to allow a
reasonable jury to find that any of the defendants used DBSI's
work product in breach of the Agreement.  Defendants' motion for
summary judgment dismissing DBSI's misappropriation claim is
granted.

## 4.  **Claims against Rhodes Individually**

Defendants move to dismiss all claims against Rhodes
individually, asserting that DBSI has no legal basis to hold
Rhodes liable in his personal capacity.  DBSI cross-moves to
establish that Rhodes may held be liable as the agent of a
partially disclosed principal if DBSI prevails on its claims
under the Addendum.  Defendants' motion is granted.

To assert agency as a defense against liability for a
contract in New York, an agent must disclose his agency status
and the identity of his principal at the time of contracting.
Orient Mid-East Lines v. Albert E. Bowen, Inc., 458 F.2d 572, 577
(2d Cir. 1972).  The purpose of this doctrine is to make sure a
party entering a contract knows precisely with whom it is
dealing; it protects a party from "unknowingly being required to
do business with an entity incapable of meeting its contractual
obligations."  USB Sec., Inc. v. Tsoukanelis, 852 F. Supp. 244,

247-48 (S.D.N.Y. 1994). Accordingly, courts have held that "nothing short of clear disclosure of the principal's corporate status will relieve an agent from personal liability." Id. at 247.

Disclosure, however, does not always necessitate disclosure of the principal's name. "Identity may be disclosed by description as well as by name." Unger v. Travel Arrangements, Inc., 25 A.D.2d 40, 47 (1st Dep't 1966). See also Instituto Cubano de Establizacion del Azucar v. The SS Theotokos, 155 F. Supp. 945, 947-48 (S.D.N.Y. 1957); Hudson Trading Co. v. Hasler & Co., 11 F.2d 666, 667 (S.D.N.Y. 1926). The key is whether the contracting party has sufficient information "to distinguish the principal from all others, or he otherwise has notice of the principal's identity." Instituto Cubano, 155 F. Supp. at 947-48. The contracting party has notice of the principal's identity when "he knows, has reason to know, or should know" of such identity. East River Sav. Bank v. Bevona, No. 94 Civ. 4508 (SAS), 1995 WL 266944, at *3 (S.D.N.Y. May 5, 1995) (quoting Restatement (Second) of Agency, § 4 cmt. a). This means the party has notice if an agent gave such information "that a reasonable person in the light of the surrounding circumstances would have understood that the agent was acting for a principal indicated, though not named." Instituto Cubano, 155 F. Supp. at 948 (quoting 1 Williston, Contracts § 288 (Rev. ed. 1936)).

In this case, the indisputable evidence shows Rhodes's status as agent was clear at the time the Engagement Letter and Addendum were executed, and no genuine issue of material fact exists regarding DBSI's awareness of the companies for whom Rhodes acted as agent when he signed the Addendum in December 2004.

Although "Rhodes Homes" is a trade name, not a corporate name, DBSI knew about the many corporate entities making up the Rhodes Homes business organization from an early point in its relationship with Rhodes Homes. A March 2004 presentation by Rhodes Homes management to the DBSI team included a chart that detailed the corporate structure for Rhodes Homes. (Sussman Decl. Ex. S at 9). The chart shows the interrelationship among Rhodes, Sagebrush, Rhodes Design and Development Corporation, and Rhodes Ranch General Partnership, among other entities. (Id.). Additionally, draft preliminary memoranda prepared by DBSI after the execution of the Engagement Letter referenced Sagebrush "d/b/a Rhodes Homes." (Stewart Decl. Ex. 20). DBSI employee Stephanie Perry also stated DBSI knew on October 24, 2004, that Sagebrush would be the borrower of bank financing. (Stewart Decl. in Opp'n Ex. 80 at 144-45). By the time the Addendum was executed in December 2004, moreover, DBSI had been contracted to provide investment banking services to Rhodes Homes for approximately ten months, giving it ample time to learn the identity of the entities using "Rhodes Homes" as a trade name.

Based on the record before the Court, then, a reasonable jury could only find that DBSI knew Rhodes was acting as agent for the group of entities comprising the Rhodes Homes organization when he executed the Agreement. No reasonable jury could find that DBSI believed it was entering into a transaction with Rhodes individually.

DBSI has presented no contradictory evidence. Instead, DBSI argues that under New York law use of a trade name is not sufficient disclosure of a principal. (Pl. Mem. at 17 (citing Lumer v. Marone, 148 Misc. 2d 997, 998 (App. Term 1990)). Here, however, the uncontradicted evidence shows that Rhodes did more than simply use a trade name when signing the Addendum. He and his associates had disclosed actual information about the corporate entities comprising the Rhodes Homes business organization. The rule cited by DBSI is inapposite. As a matter of law, Rhodes's status as agent and the identity of his principals were adequately disclosed at the time the Addendum was executed. Accordingly, summary judgment is granted dismissing the claims against Rhodes individually.

## C. **Plaintiff's Motion for Partial Summary Judgment**

DBSI moves for partial summary judgment (1) granting judgment in its favor on its breach of contract claim, (2) striking defendants' affirmative defenses, (3) dismissing Sagebrush's counterclaims, and (4) establishing the joint and several liability of all defendants. I discuss each prong of the motion in turn.

## 1. **Breach of Contract**

DBSI argues it is entitled to a fee under the Addendum even though the credit facility ultimately obtained by Rhodes Homes was facilitated by another investment banking firm, CSFB. DBSI contends that the unambiguous language of the Addendum entitled it to a fee for any credit facility arranged during the Exclusivity Period, regardless of whether DBSI procured the financing. I agree. Although the Addendum is not free from all ambiguity, I conclude, in light of the plain wording of the Addendum and all the circumstances, that the Addendum does not "admit[] of more than one reasonable interpretation when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood" in the investment banking industry. MG Refining & Mktg., Inc., 25 F. Supp. 2d at 180 (internal quotations and citation omitted).

First, the language of the Addendum strongly supports DBSI's interpretation. DBSI's fees were payable "[i]n connection with any such bank financing," "in the event of a closing of any facility." (Addendum at 1) (emphasis added). The phrases "any such bank financing" and "any facility" strongly suggest that DBSI did not have to be involved in the closing for it to be entitled to a fee. If the parties had intended that DBSI would be paid only with respect to financing that it procured, they could have so provided. Instead, they used the word "any" twice.

-28-

Second, DBSI's interpretation of the Addendum is consistent with the parties' intent as to one of the key features of their agreement -- exclusivity. DBSI agreed to be engaged only on an exclusive basis, and this purpose of the Addendum would best be effectuated by an interpretation that if defendants breached the Addendum by using the services of another investment banking firm, DBSI would be paid nonetheless.

Third, as the cases cited by DBSI make clear, it is not uncommon in the investment banking field for investment banks to be contractually entitled to fees even when they do not arrange or facilitate the transactions. See, e.g., CIBC World Mkts. Corp. v. Techtrader, Inc., 183 F. Supp. 2d 605 (S.D.N.Y. 2001); Lazard Freres & Co. v. Crown Sterling Mgmt., Inc., 901 F. Supp. 133 (S.D.N.Y. 1995); Chase Manhattan Bank, N.A. v. Remington Prods., Inc., 865 F. Supp. 194 (S.D.N.Y. 1994), aff'd, 71 F.3d 407 (2d Cir. 1995); PaineWebber Inc. v. Campeau Corp., 670 F. Supp. 100 (S.D.N.Y. 1987). These cases serve to show industry practice and support the reasonableness of DBSI's interpretation.

Defendants make a half-hearted effort to point to provisions of the Addendum that purportedly create ambiguity, but with little success. (Defs.' Opp'n Mem. at 14-16). For example, they refer to the language providing for a fee of "2.25% of the total aggregate amount of the Facilities payable at the closing of such issuance," and argue that "Facilities" refers to the $300 million facility to be arranged by DBSI. (Id. at 14). If the parties had intended the fee to be limited to 2.25% of $300

-29-

million, they could have so provided instead of setting forth a formula that seemingly contemplated the possibility of varying amounts. Defendants also point to purported ambiguity in the provision limiting exclusivity to the "earlier of (x) one year and (ii) the date the [parties] reasonably determine that the closing of the Facilities cannot be consummated within such one year period because of adverse market conditions." Defendants argue that the phrase "adverse market conditions" is ambiguous. This argument is beside the point. It does not address the issue of whether DBSI is entitled to a fee with respect to financing facilitated by another company, but rather is relevant to the issue of whether either side had the right to terminate in less than a year.

Defendants' principal opposition to this prong of DBSI's motion is to argue that the cases relied on by DBSI are distinguishable. (Defs.' Opp'n Mem. at 11-14). The cases are different, as they involve different contracts and different language. But the concepts are the same. In these cases, the language of the agreements and the totality of the circumstances showed unambiguously that the investment banks were entitled to fees, under exclusivity provisions, even if the clients obtained financing through others. Comparable language and circumstances exist here.

This prong of DBSI's motion is granted, and defendants' argument that the Addendum provides for payment to DBSI only for financing obtained by DBSI is rejected as a matter of law. This

-30-

does not mean that DBSI is entitled to summary judgment in its favor on its breach of contract claim; as discussed below, defendants have presented other triable defenses.

## 2. **Defendants' Affirmative Defenses**

Defendants asserted fourteen affirmative defenses in their answer. DBSI moves to strike eleven of these defenses as insufficient as a matter of law: first and third (lack of personal jurisdiction and improper venue over certain defendants); second (failure to state a claim); fourth (unavailability of consequential damages); eighth (misrepresentation); ninth, eleventh, and seventh (the related defenses of failure to perform, prior breach, and failure of consideration); tenth (set-off); twelfth (release); and fourteenth (failure to mitigate damages). DBSI's motion to strike these affirmative defenses is granted in part and denied in part, as follows.

The jurisdiction and venue defenses are moot as to Rhodes, as the claims against him are dismissed for reasons set forth above. The jurisdiction and venue defenses are stricken as to Heritage and the Rhodes Companies, as they are bound by the provisions in the Engagement Letter and Addendum consenting to the jurisdiction of the state and federal courts in New York City and waiving any objections to venue. These agreements, on their face, engaged not just "Rhodes Homes," but its subsidiaries as well.

-31-

The failure to state a claim defense is stricken; we are well beyond the pleadings stage. Of course, certain of DBSI's claims are dismissed in this decision in any event.

The fourth affirmative defense, unavailability of consequential damages, is stricken. Defendants do not address the prong of DBSI's motion seeking to strike this defense. Moreover, DBSI is not seeking consequential damages, as it is seeking only its contractual remedies.

The motion to strike is denied as to the eighth affirmative defense, misrepresentation. Defendants may seek to show at trial that they were misled into hiring DBSI by the latter's purportedly false representations that it had been involved in "comparable" financings.

The motion to strike is denied as to the seventh, ninth, and eleventh affirmative defenses, as these defenses involve disputed facts revolving around DBSI's purported failure to perform. If DBSI materially breached by failing to perform as it was supposed to under the agreements, then defendants did not get what they bargained for and their obligation to pay may be excused.

The motion to strike the tenth defense, set-off, is denied, as one of Sagebrush's counterclaims survives, as set forth below.

The motion to strike the twelfth defense, release, is denied, as factual issues exist as to whether DBSI released defendants from the exclusivity provisions of the agreements.

The fourteenth defense, failure to mitigate damages, is stricken. Defendants do not respond to this prong of the motion, and the defense is inapplicable in any event, as DBSI is seeking contractual damages based on the breach of an exclusivity provision, and there was nothing that it could have done in mitigation.

## 3. **Sagebrush's Counterclaims**

DBSI moves for summary judgment dismissing the two counterclaims asserted by Sagebrush against DBSI. Sagebrush alleges malpractice, claiming DBSI breached its duty of care in rendering professional services, and breach of contract, claiming DBSI's performance under the contract was "spectacularly incompetent." (Defs.' Opp'n Mem. at 24). DBSI's motion is granted as to the malpractice counterclaim and denied as to the breach of contract counterclaim.

### a. **Malpractice**

The issue is whether an investment bank's performance of a contract for financial services can give rise to a cause of action for malpractice.

Generally, breach of contract does not give rise to liability in tort unless a legal duty independent of the contract itself has been violated. Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d at 389. Such independent legal duty may be imposed by law as an incident to the parties' relationship. Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 551 (1992). Professionals may be subject to tort liability under this

-33-

exception for failure to exercise reasonable care, irrespective of their contractual duties. Id. (citations omitted). In such cases, it is public policy, not the contract, that gives rise to the duty of due care. Id. at 552.

The New York Court of Appeals has never found financial institutions such as investment banks to be professionals for these purposes, and defendants do not cite to any New York decisions holding investment banks liable on a professional malpractice theory. On the contrary, courts have found that in actions involving the contractual duties of corporations and financial institutions, a negligence action may not be maintained and parties must proceed under a contract theory. See TD Waterhouse Investor Servs., Inc. v. Integrated Fund Servs., Inc., No. 01 Civ. 8986 (HB), 2003 WL 42013, at *12-13 (S.D.N.Y. Jan 6, 2003) (holding accounting firm had no duty to client beyond terms of contract); THC Holdings Corp. v. Tishman, Nos. 93 Civ. 5393, 95 Civ. 4422 (KMW), 1998 WL 305639, at *4 (S.D.N.Y. June 9, 1998) (holding no special relationship existed between investment bank and corporate client giving rise to tort-based duty independent of parties' contractual obligations).

Accordingly, I hold that DBSI had no professional or otherwise special relationship with Sagebrush such that a tort-based duty independent of the parties' contract arose. Like the parties in THC Holdings Corp. v. Tishman, the parties here are sophisticated entities that entered into a time-limited financial contract. No significant public interest is linked to DBSI's

provision of investment banking services to Sagebrush that would
weigh in favor of imposing tort liability for public policy
reasons. See TD Waterhouse Investor Servs., 2003 WL 42013, at
**12-13 (holding no public interest concerns raised by accounting
services contract); cf. Sommer, 79 N.Y.2d at 553 (holding
significant public interest in proper installation and
functioning of alarm systems justified imposition of tort
liability on fire alarm company). Unlike in Sommer, the only
injury contemplated here is economic injury. But "where the
injury alleged is solely economic and where there was no
cataclysmic occurrence, New York courts have rejected negligence
claims." TD Waterhouse Investor Servs., 2003 WL 42013, at *12
(citing Asian Vegetable Research & Dev. Center v. Inst. of Int'l
Educ., 944 F. Supp. 1169, 1181 (S.D.N.Y. 1996)). "[M]erely
alleging that the breach of contract duty arose from a lack of
due care will not transform a simple breach of contract into a
tort." Sommer, 79 N.Y.2d at 551.

Sagebrush cites Hydro Investors v. Trafalgar Power,
Inc. in support of its claim, presumably for the proposition that
an action for professional malpractice may be maintained and tort
damages recovered even when losses are restricted to economic
losses. Hydro Investors v. Trafalgar Power, Inc., 227 F.3d 8,
15-18 (2d Cir. 2000). In Hydro Investors, however, the Second
Circuit's decision was premised on the fact that services
rendered were "professional," engineering in that case. Id. at
15. There is no such premise here. Additionally, the Hydro

-35-

Investors court emphasized that the damages awarded were for a harm distinct from losses related to breach of contract. Rather, the harm arose out of mistakes made by the engineering professionals contracted to render services to a hydroelectric power plant. Id. at 18. In this case, defendants do not allege DBSI made mistakes in its work leading to losses for Rhodes Homes. Instead, defendants allege DBSI did nothing, in breach of its contractual promise to raise debt capital for Rhodes Homes. Sagebrush must pursue this counterclaim in contract, not in tort.

## b. **Breach of Contract**

Drawing all inferences in favor of Sagebrush as the non-moving party, I conclude that a genuine issue of material fact exists as to whether DBSI breached the Addendum by failing to use its "best efforts" when exercising its exclusive rights to facilitate a debt financing transaction on behalf of Rhodes Homes. DBSI's motion for summary judgment to dismiss the breach of contract counterclaim is denied.

Under the Addendum, DBSI had the "right, but not the obligation, to act as sole book-running manager, and DBSI ha[d] the right but not the obligation to act as exclusive underwriter, initial purchaser, placement agent or syndication agent in connection with any bank or loan financing consisting of institutional and/or pro rata loans of [Rhodes Homes] or its subsidiaries during the term of this Agreement on a best efforts basis." (Addendum at 1). Sagebrush has presented sufficient evidence indicating that DBSI chose to exercise these exclusive

-36-

rights but failed to use its best efforts in doing so. (See, e.g., Stewart Decl. Exs. 41-50; Stewart Decl. in Opp'n Ex. 79 at 143, Ex. 80 at 149-50). A reasonable jury could find that DBSI breached the Addendum in this respect; therefore DBSI's motion is denied.

## 4. **Liability of Various Rhodes Entities**

DBSI moves for summary judgment to establish the joint and several liability of all defendants if DBSI is awarded damages on its claims under the Agreement. As discussed supra, I am denying plaintiff's motion as to Rhodes's individual liability. Defendants do not oppose plaintiff's motion regarding the prospective liability of the other defendants, and the record supports DBSI's assertion that they can each be considered one of the entities doing business as Rhodes Homes or a subsidiary of an entity doing business as Rhodes Homes. Rhodes Homes "and [its] subsidiaries" engaged DBSI in the Agreement. (Engagement Letter at 1; see Addendum at 1). Accordingly, I grant DBSI's motion as to Sagebrush, Rhodes Design and Development Corporation, The Rhodes Companies, Rhodes Ranch General Partnership, and Heritage. To the extent that these defendants are found liable, they will be so held on a joint and several basis.

## CONCLUSION

For the foregoing reasons, and to the extent set forth
above, the cross-motions for summary judgment are denied in part
and granted in part. The parties shall appear for a final
pretrial conference with the Court on October 17, 2008, at 3 pm.

SO ORDERED.

Dated:   New York, New York
         September 29, 2008

DENNY CHIN
United States District Judge

-38-

**APPEARANCES**

SUSSMAN & FRANKEL, LLP
    By:  Neil A. Sussman, Esq.
805 Third Avenue, 11th Floor
New York, New York  10022

- and -

MERTZ, TALBOTT & SIMONDS, PLC
    By:  Gregory S. Mertz, Esq.
126 College Street, Suite 305
P.O. Box 1398
Burlington, Vermont  05402-1398
Attorneys for Plaintiff Deutsche Bank
    Securities Inc.

STEWART OCCHIPINTI, LLP
    By:  Charles A. Stewart, III, Esq.
         Frank S. Occipinti, Esq.
         Abigail D. Rubin, Esq.
65 West 36th Street, 7th Floor
New York, New York  10018
Attorneys for Defendants James M. Rhodes,
    Sagebrush Enterprises, Inc., The Rhodes
    Companies, LLC, Heritage Land Company, LLC,
    Rhodes Design and Development Corporation and
    Rhodes Ranch General Partnership.